ROBERT E. CARR v. A. C. WILLIAMS, et al.

STATUTE OF FRAUDS; *Parol Agreement for Sale of an Interest in Lands.* Where the owner of certain land sells the same and executes to the purchaser a title-bond therefor, binding himself upon certain conditions to execute to the purchaser, his heirs and assigns, a general warranty deed therefor; and the purchaser under said title-bond is to have the possession of the land; and afterward the purchaser sells said land to another person, and delivers to such other person all his title-papers; and afterward the first purchaser makes an executory parol contract with the vendor to "surrender the title and title-papers to said land" back to the vendor within a certain time thereafter, and upon certain conditions, and afterward the second purchaser ratifies said executory parol contract, and then the two purchasers offer to perform such contract on their part, but the vendor refuses to perform on his part, *held,* that said executory parol contract, being a contract for the sale and transfer of an interest in land, is void under the statute of frauds.

*Error from Leavenworth District Court.*

THE opinion contains a full statement of the pleadings, and facts. The district court, at the February Term 1875, gave judgment in favor of *Williams* and *Stanton*, defendants, against *Carr*, plaintiff, and the plaintiff brings the case here on error.

*J. P. Usher*, and *C. E. Bretherton*, for plaintiff.

*Stillings & Fenlon*, for defendants.

The opinion of the court was delivered by

VALENTINE, J.: This was an action on three promissory notes, and to foreclose a vendor's lien on certain real estate, for the purchase of which real estate said promissory notes were given. The facts of the case, stated in brief, are substantially as follows: On May 12th 1871, the plaintiff Carr owned said real estate, and sold the same to the defendant Williams for $1,280, receiving $320 thereof in cash, and the balance in three promissory notes each for $320, and due in one, two, and three years, respectively. Carr gave no deed for the land, but gave a title bond therefor, containing among others the following conditions and stipulations, to-wit:

"Now the condition of this obligation is such, that if the said A. C. Williams shall pay the said notes, and interest thereon, as therein specified and set forth, together with all taxes, both general and special, assessed against the above described lands and premises, then the said Robt. E. Carr will, without delay, execute to the said A. C. Williams, heirs and assigns, a deed of general warranty, conveying to the said A. C. Williams all his right, title and interest in and to the above described tract of land. And the further condition of this obligation is such, that if default shall be made in said payments, or any part thereof, as specified, then and in that case the said A. C. Williams will deliver up peaceable possession of said premises unto the said Robt. E. Carr, his heirs or assigns, and relinquish all right or claim in law or equity to all and singular the sum or sums of money that may have been paid by the said A. C. Williams, which sums he agrees to forfeit as liquidated damages for the use and occupation of said lands and premises.

"And the further condition of this obligation is such, that if default be made in the payments above specified, and the said Robt. E. Carr shall elect to pursue his remedy in law or equity for the enforcement of said payments, then and in that case the said A. C. Williams hereby waives all benefit or advantage of the provisions of an act entitled 'an act to provide for the redemption of real estate sold under execution, order of sale, or other final process,' approved June 4th 1861.

"And the further condition of this obligation is such, that the said A. C. Williams shall not cut down or carry away, nor shall he allow to be cut down or carried away, any growing timber on said premises, other than what may be necessary for the improvements on said premises, and for the individual use of said party for fuel, nor shall he do or allow to be done any act of waste upon said premises; otherwise, this obligation shall be void and of no effect."

Afterward Williams sold said land to the defendant Stanton for the contract-price of $1,680, receiving in cash $720, and Stanton was to pay said three promissory notes to the plaintiff Carr. But neither Stanton nor Williams ever paid said promissory notes, nor said taxes. Therefore, after said promissory notes had all become due, and after three years' taxes had accrued against said land, and the land had been sold therefor, the plaintiff Carr commenced this action, and asked for a judgment against Williams for the amount of said notes and costs, and that said land be sold to satisfy said judgment and taxes, and that Williams' and Stanton's interests in said land be barred and foreclosed. The defendants answered setting forth —

"That the notes sued on in this action were given for purchase-money on the said land set out in said petition, and that in the month of January 1874, said Williams made an agreement with Abrams & Harris, a firm doing business as commission agents in the city of Lawrence, and who were then and there the duly-authorized agents of said plaintiff, by which it was agreed between said plaintiff and said Williams, that said Stanton and Williams should surrender the title and title-papers to said land, and that the notes and mortgage set out in said petition should be surrendered to said Williams, and these defendants allege that said surrender was to be made within three weeks thereafter; and these defend-

ants allege that they complied with said agreement, and offered and tendered the surrender of said title and title-papers within said three weeks to said plaintiff, and that said plaintiff neglected and refused to surrender or deliver up said notes and mortgage; wherefore these defendants ask that said plaintiff be compelled to surrender up and cancel said notes and mortgage."

The plaintiff replied to this answer as follows:

· "The plaintiff admits the making of the agreement in said answer alleged, with the explanation that the title to be so surrendered was expressly agreed to be a title free from any tax lien created by the non-payment of the taxes stipulated to be paid by said A. C. Williams. And plaintiff denies that the said defendants offered and tendered the surrender of such title and title-papers within three weeks, or at any other time after the making of the agreement in said answer alleged, but on the contrary, says, that defendants, or one of them, had incumbered the title to the premises by allowing the same to be sold, on or about the 10th of May 1872, for the taxes levied thereon for the year 1871, amounting to $55.80, and on or about the 18th December 1872, for the taxes of the year 1872, levied thereon, amounting to $38.69, and on or about the 10th day of November 1873, for the taxes levied thereon for the year 1873, amounting to $37.14, and never discharged said liens and incumbrances so as to be able to give title to said premises at any time previous to the commencement of this suit."

On 24th February 1875, this case came on regularly for trial before the court and a jury. Counsel appeared for each party. It was then admitted that the statement of unpaid taxes in the replication, was correct. Defendant then opened, and called the following witnesses, who testified as follows:

"A. C. Williams: I am one of the defendants in this action. I have known Abrams & Harris for five or six years. I made my original contract for purchase of the land with Abrams. Some time afterward I sold Stanton, my co-defendant, the land, and informed Harris of the sale having been made. In January 1874, I met Abrams in Lawrence. He spoke to me about the non-payment of the first and second notes. I told him I did not think Stanton could pay the notes, and that I would like to get up and surrender the bond. He said if it was done within three weeks from that time he would sur-

render the notes. I soon after met Stanton and paid him $250 to get the bond. This was about a week after the conversation with Abrams."

*On cross-examination, witness said:* "Stanton paid me fifty cents on the acre more than I paid Mr. Carr for the land, that is, in all, $400. The land has never been fenced or cultivated. In January 1874, I met Abrams in Lawrence. He said to me that Stanton was not meeting those notes. Two were then dishonored, one note not then due. I said, Stanton could not pay, as his circumstances had altered since he bought the land from me. He had lost his place. I then asked him if he would return the notes if I would give up the land and surrender the bond. He said he would, if I would return the bond within three weeks. I knew nothing about taxes at that time; I did not know whether they were paid or not. Abrams rode with me on the cars to Tonganoxie, and asked me if the taxes had been paid. At that time I did not know, and so told him. I told Stanton when I next saw him what had taken place; agreed to divide the loss of what he had paid me. The extra $50 was for the use of the money; that is, the difference between $250 which I paid him, and half of the $400 which he originally paid me. I have no further personal knowledge of the matter. I never knew the negotiation had failed until after the suit had been commenced. I went to the Indian nation soon after my conversation with Abrams, and was absent for a considerable time."

"*James Stanton:* About January 24th 1874, I held the title-bond to the land in question. Williams then proposed we would surrender the bond and get the notes for the purchase-money. I soon after went to Abrams & Harris' office in Lawrence; I saw Harris, and told him my business. He said he had not the notes there, but would send for them, and I might leave the bond. I said I would keep the bond, and surrender it when I heard from him that the notes were come. The subject of taxes was first mentioned to me by Mr. Harris after service of the summons in this case."

*On cross-examination, witness said:* "This occurred somewhere from January 20th to January 24th. Williams saw me and asked me, could I pay for the land? I said 'I could not.' He then asked me, would I surrender the bond? I said, 'Yes, I would.' He then asked how much I wanted to do so? No precise amount was then agreed upon. We agreed to divide the loss, which was about $200 or $300; the

exact amount I don't know.   I went to Lawrence to see
Abrams & Harris.   I saw Mr. Harris, and told him my
business.   I said I had brought the title-bond to surrender
in order to get Williams' notes.   Harris said the notes were
in St. Louis; said I could leave the bond with him and
come and get the notes when they came.   I thought I had
better keep the bond.   He said he would write me a note
as soon as he got the notes.   He asked me to hold on to the
land, and he would extend the time for payment of the pur-
chase-money.   I told him I was unable to complete the pur-
chase, any way.   Nothing was said about taxes.   I knew I
had to pay the taxes according to the terms of the bond.   I
said nothing to Harris about any taxes being then due; the
subject was not mentioned.   This interview was in January.
Service of summons in this case was made on me in the sum-
mer; I suppose it was in June.   I heard nothing whatever
of the matter during the intervening six months.   I think he
figured up what interest, taxes and back payments would be,
if I kept the bond.   I wanted to find what it would cost to
do so.   I don't know whether he had the amount of the notes
or not; I am not positive whether he had the amount of the
taxes or not."

*On re-examination, he said:* "A note of mine which was
held by Williams was satisfied in part by the $250 he agreed
to give me back; I don't know whether I have destroyed
that note or not."

The above was all the evidence adduced on behalf of the
defendants, and they then rested their case.   Plaintiff then
demurred to the evidence adduced by the defendant, on the
grounds that it did not show any facts constituting a defense
to the action, and moved for judgment.   The court overruled
the demurrer and motion, and plaintiff excepted.

The plaintiff then introduced the testimony of the wit-
nesses Harris and Abrams, which testimony shows that no
written contract such as stated in the defendants' answer was
ever made, and further shows that if any contract similar to
that was ever made it was a parol contract, and such a con-
tract as is set forth in the plaintiff's replication.   This is all
the evidence that was introduced on the trial.   The court
then instructed the jury that it was not necessary that the
contract set up in the defendants' answer should be in writing,

to which instruction the plaintiff excepted. The jury then found a verdict in favor of the defendants, and against the plaintiff.

We think it will be seen from the foregoing statement of the facts, that the only questions involved in this case are, whether a valid contract was made between the plaintiff and the defendants, and whether the defendants performed or offered to perform the contract on their part. Now we must assume that the contract admitted in the plaintiff's reply was a valid contract. That is, we must assume that the contract, "that said Stanton and Williams should *surrender the title* and title-papers to said land, [to Carr,] and that the notes and mortgage set out in said petition should be surrendered to said Williams," (see defendants' answer,) and "that the title to be so surrendered was expressly agreed to be a title free from any tax-lien created by the nonpayment of the taxes stipulated to be paid by said A. C. Williams," (see plaintiff's reply,) was a valid contract. But the defendants never performed or offered to perform this contract. They never offered to surrender the title freed from taxes, or tax-liens. They never even offered to surrender back as good a title as they received from Carr. They received their title from Carr, free and clear from all taxes and tax-liens. But if they ever offered to surrender any title back to Carr, which may be questioned, it was a title incumbered with taxes and tax-liens. It was admitted on the trial, and also proved, that they never paid any of the taxes on said land, and that the land was sold for such taxes, and there was no evidence introduced tending to show the contrary. The defendants therefore cannot defeat the plaintiff's action under the contract admitted by the plaintiff in his reply.

If the defendants can defeat the plaintiff's action at all, it must be under the contract set up in the defendants' answer. And even under that contract, if it may be construed to be the same as is admitted in the plaintiff's reply, they cannot defeat the plaintiff's action. But probably it may be construed differently, as follows: They allege in their answer

that they were to "surrender the *title* and title-papers to said land." Now it may be that they did not intend to surrender such a title as they received from Carr — a full equitable title, unincumbered by taxes and tax-liens, as alleged by the plaintiff's replication — but just such a title as they then had. Assuming that this is what they meant, we shall now proceed to consider whether they made out a defense upon this assumption. At the time that this supposed contract was made the legal title to the property was in Carr, and the equitable title thereto was in Stanton. Stanton then had the title-papers given to Williams. The equitable title had passed from Carr to Williams, and from Williams to Stanton. By this contract the equitable title (or so much of it as was left, considering its subserviency to said taxes and tax-liens,) was in some manner to pass back to Carr, whether directly from Stanton to Carr, or indirectly, from Stanton to Williams and from Williams to Carr, the defendants have not informed us. But in whatever manner the title was to pass, the contract therefor was wholly executory. The contract was made by Carr through his agents, Abrams & Harris, on the one side, and by Williams on the other side, and was afterward ratified by Stanton; but no part of the contract was ever reduced to writing, and no part of the same was ever executed. No title, or title-paper, or possession, was ever surrendered by the defendants, nor did the plaintiff surrender his notes, or vendor's lien. All parties continued to retain just what each had, respectively, before the contract was made. We shall assume for the purposes of this case, that the defendants offered to perform on their part, though this under the evidence may be questioned. The only question then left is, whether said parol executory contract is valid or not. We must answer this question in the negative. The contract is void under the statute of frauds. (Gen. Stat. 505, §§ 5, 6.) To have made it valid, it should either have been reduced to writing, or should have been executed. In reply to a suggestion made by the defendants, we would say, that the title-bond does not provide that in case of a default the

interest of Williams and his heirs and assigns shall cease. Nor does it give to Williams or to his heirs or assigns any power to terminate said contract. And we hardly think it even gives to Carr any such power. But even if it does give to Carr any such power, he has never in fact exercised it. The defendants do not rely upon any actual termination of their original contract. But they rely merely upon a subsequent executory contract, providing by its terms that the parties should thereafter within three weeks, and upon certain conditions, terminate such original contract. Now where is the consideration for this executory contract? If Carr had the absolute right at his own option to terminate said original contract, then where was the new consideration going to Carr to sustain an executory contract compelling him to terminate said original contract? If however Carr had no such right to terminate said original contract at his own option, and if therefore the defendants' promise to surrender their equitable title, and the title-papers to said land, is a sufficient consideration for the plaintiff's promise to surrender the notes, and to terminate said original contract, then this new contract is an executory parol contract for the sale and transfer of an interest in land, and is therefore void under the statute of frauds.

Before closing this opinion we might say that the title-bond itself gives to Carr the right to "elect to pursue his remedy *in law or equity* for the enforcement of said payment" of said promissory notes. And he is now pursuing just such a remedy.

The judgment of the court below will be reversed, and cause remanded to the court below for a new trial.

BREWER, J., concurring.

HORTON, C. J., not sitting in the case.